Filed 4/15/13  S.S. v. Superior Court CA4/3

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| S.S., <br><br>     v. <br><br> THE SUPERIOR COURT OF ORANGE COUNTY, <br><br>    Respondent; <br><br> ORANGE COUNTY SOCIAL SERVICES AGENCY, et al., <br><br>    Real Parties in Interest. | G047800 <br><br> (Super. Ct. Nos. DP020946 & DP020947) <br><br> ORDER MODIFYING OPINION; NO CHANGE IN JUDGMENT |

On the court's own motion, it is ordered that the opinion filed on April 12, 2013 be modified as follows:

1.  On page 12, in the last sentence of the last paragraph, the word "affirm" is deleted and "deny the requested relief" is inserted so that the sentence reads:

But the record does not reveal the court abused its discretion in ordering removal and we must deny the requested relief.

2.  On page 12 in the disposition , after the sentence reading "The petition is denied," add the following sentence:

       The stay of the court's order removing the children from grandmother's home is dissolved.

This modification does not change the judgment.


                THOMPSON, J.

WE CONCUR:


O'LEARY, P. J.


RYLAARSDAM, J.

Filed 4/11/13  S.S. v. Super. Ct. CA4/3 (unmodifed version)

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FOURTH APPELLATE DISTRICT

### DIVISION THREE

| | |
|---|---|
| S.S.,<br><br>    v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>  Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY, et al.,<br><br>  Real Parties in Interest. | G047800<br><br>(Super. Ct. Nos. DP020946 & DP020947)<br><br>O P I N I O N |

Original proceeding; petition for a writ of mandate to challenge an order of the Superior Court of Orange County, Jacki Brown, Judge.  Petition denied.

Nicole Williams for Petitioner.

No appearance for Respondent.

Law Office of Harold LaFlamme and Yana Kennedy for the Minors.

Nicholas S. Chrisos, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel for Real Party in Interest Orange County Social Services Agency.

Petitioner S.S., the maternal grandmother and prospective adoptive mother of child 1 and child 2 (collectively the children), now four and two years old, respectively, challenges an order removing the children from her care pursuant to Welfare and Institutions Code section 366.26, subdivision (n) (all statutory references are to this code). She claims the court abused its discretion when it removed the children because there was insufficient evidence removal was in their best interests, and it failed to consider the children's circumstances at the time of removal.

Real party in interest Orange County Social Services Agency (SSA) opposes the petition, arguing there was sufficient evidence to support the court's discretionary ruling ordering removal. The children joined in SSA's opposition.

We conclude the court did not abuse its discretion and deny the petition.

FACTS AND PROCEDURAL HISTORY

After child 2 was born in March 2011, he and his two-year-old brother child 1 were taken into custody by SSA because child 2 and his biological mother[1] tested positive for methamphetamine and marijuana. The children were placed with grandmother. Six years earlier grandmother had adopted the children's half-brother, R.S., who had been born with methamphetamine in his system, after mother failed to complete her service plan.

In 2006 there were two child abuse registry referrals against grandmother about R.S. In one mother was driving while intoxicated with R.S. in the car. Grandmother advised she allowed mother to take R.S. without supervision because mother had been taking substance abuse classes for about six months and grandmother did not believe she had been on drugs or drinking. A dependency petition was filed and

_____

[1] The biological mother and father's parental rights were terminated before these proceedings but for ease of reference we will refer to them as mother and father.

later dismissed after grandmother was put on an intense supervision program. R.S. was returned to her custody. When asked about this in 2011, grandmother explained she had not given mother permission to take R.S.

Another referral occurred six months later when mother and her boyfriend, who had each been drinking, drove home from a party with R.S. in the car. During the drive in the course of a fight, the boyfriend began to hit mother and during the altercation hit R.S. in the mouth, cutting his lip. Paramedics were called. Grandmother then allowed mother to stay overnight at her house despite knowing she was not allowed to do so. General neglect claims against grandmother were found to be "inconclusive."

In June 2011 when the children were declared dependents and removed from parents' custody, the court granted parents reunification services. During this time mother was allowed visits with the children at grandmother's home; grandmother was authorized to act as monitor.

Visits went well until November when mother and grandmother began arguing. Mother physically attacked grandmother until the babysitter interceded and grandmother called 911. The children were in the house and not involved. Thereafter, upon mother's report the babysitter had recently been arrested for possession of methamphetamines and his admission, grandmother had him leave. The babysitter advised grandmother mother had threatened to kill grandmother and then herself if she was not allowed to visit the children.

SSA and grandmother set up a safety plan, including grandmother's agreement to call the sheriff's department about mother's threat. Subsequently grandmother called the social worker, relating she had not called the sheriff because she thought the babysitter might have told her about the threat in retaliation for mother's disclosure of his drug arrest. She also was concerned if the sheriffs contacted mother she might become even more upset. But grandmother did agree to abide by the safety plan and call 911 if she had any concerns about safety.

3

In December the children's counsel asked the court to at least temporarily move mother's visits to another location with a different monitor until mother could become more stable. A social worker who observed mother visiting at grandmother's home called the interactions "appropriate." Grandmother told the social worker she did "not feel threatened" and wanted to continue monitoring the visits at her home. She also advised she had arranged for another adult to be there during visits. Nevertheless the court ordered the visits to be at a neutral location until its next review hearing in January 2012. At that hearing the court terminated parents' services and set a permanency hearing (§ 366.26).

In March 2012 in a report originally prepared by the children's Court Appointed Special Advocate (CASA) Kathi Smith noted child 2 appeared to be "very bonded to his grandmother and to his brothers" and both children were "happy, loved, and well-cared for." She also advised grandmother would be "an excellent caregiver."

On May 5, 2012 a social worker went to grandmother's home to investigate the November 2011 altercation between mother and grandmother. When she arrived child 2 was there with mother and father; neither grandmother nor the approved caregiver were present. Mother appeared to be under the influence of something. Mother was dressed in beachwear and had a bag holding beach paraphernalia; father was also in beach clothing.

When grandmother arrived home with child 1, he also was dressed in beach clothes and carried new beach toys. Grandmother explained father was allowed monitored visitation and a monitor had been there when she had gone to the market. But the monitor had left before the visit ended. She also stated mother was not allowed to be at the house. The social worker found a closet full of mother's clothes in R.S.'s bedroom along with a mattress on his bedroom floor; a pair of mother's underwear was nearby.

Grandmother explained one of the children must have taken them out of the closet. She also stated neither parent lived with her or even stayed the night. She denied

4

there was a family beach day in the offing. She told the social worker she had last seen mother about the time mother had assaulted her in November but explained child 1 said he had seen mother on the outside of the backyard fence. A few days later R.S. confirmed grandmother's statement mother had not been there since November and did not live there.

When the social worker spoke to the monitor, Diane, Diane stated she had left because she believed grandmother would be home soon and "'was just ready to go home.'" Diane is mother's godmother. She explained she loves mother a lot and likes to spend time with her. When she stopped by grandmother's home, sometimes mother is there. Diane does not think mother would harm the children although she did concede mother was having problems with sobriety.

A safety plan was put in place "[d]ue to the grandmother's lack of boundaries" to include daily safety checks and a prohibition against either parent entering the home. The social worker also suggested mother's belongings be removed from the house, which grandmother arranged.

SSA then determined the children should be removed from grandmother's care "[d]ue to a constellation of events and risk factors that include the grandmother's inadequate boundaries and judgment regarding the parents." It did "not believe . . . grandmother [could] protect the children . . . from their parents . . . ." It noted "poor decisions" grandmother had made, including in the case of R.S, despite "many years of involvement with SSA and the Juvenile Court, and ongoing instruction by several different social workers over the years." It also described the positives about placement of the children with grandmother, including grandmother's love of the children and her "belie[f] she is providing them with excellent care," the children's attachment to R.S., and CASA Smith's belief grandmother should be allowed to adopt.

The next day SSA, joined by counsel for the children, moved to terminate the children's placement with grandmother. Grandmother informed the court she would

5

remain with the children at all times. In the interim the court allowed the children to remain with her, issued the restraining order against the parents grandmother had requested, and ordered grandmother to remove all of parents' possessions from her home.

The parents' permanency hearing report stated grandmother verified she had removed parents' belongings from the home. The social worker did not see "any obvious signs of" them but could not distinguish mother's and grandmother's possessions. It concluded grandmother should not be allowed to adopt because she was unable to protect the children from their parents. A few weeks later CASA Smith reported her belief it would be "traumatic" for the children to be removed, grandmother knew she needed to take part in services, and that the incident in May had made her realize she needed assistance to help her set boundaries.

There were three case social workers who handled the case for different periods of time and one social worker who was assigned to evaluating the potential adoption by grandmother. At the removal hearing, the testimony of the three case social workers was mixed. Two had no reason to recommend removal of the children from grandmother. One of them testified that grandmother took good care of them; her problem was protecting them from mother. He also testified it would be hard on the children to be separated from grandmother and R.S.

The third case social worker was the one who had been present at the May incident and she repeated what she had included in her earlier report. She also testified mother had told her she would be going to the beach after finishing with the children. On that day she believed there was a "high possibility" the children would need to be removed. It was her opinion grandmother had problems setting boundaries for the parents. The social worker was concerned grandmother could be allowing unapproved visits by mother. She noted Diane's statement she sometimes saw mother at grandmother's home. Grandmother had been paying mother's cell phone bill but when she suggested grandmother no longer do so, grandmother agreed she would stop.

6

The adoption social worker was recommending against a home study, whether or not the children were removed. As opposed to the care social workers, who look at "short-term care," she had to look at care extending over the rest of the children's lives. Her concern was that grandmother did not have the "ability to protect the children from their birth parents," and she had concluded grandmother did not have the ability to keep mother away from the children. Grandmother's behavior since the May incident did not change her mind.

CASA Smith saw nothing in her 12 or so visits to grandmother's home that would point to removal. Rather, she saw a "very loving relationship" and believed removal would be detrimental. The paternal grandmother agreed, praising grandmother's care and testifying removal would be "utterly devastating."

During grandmother's testimony she explained the two incidents with R.S., stating as to the first she had never given mother permission to take him in the car and denying she had ever told the social worker any different. She later testified that as to the party to which mother had taken him, she had given permission for R.S. to attend because there was to be a monitor there and there was only a remote possibility mother might be there. She thought mother had progressed in her treatment so that even if she attended it would not be a problem

As to the second incident, she stated mother had talked the daycare provider into letting R.S. leave with her. She also testified mother had never stayed at her home since that day. She had begun voluntary services after that second incident, had gone to counseling and Alanon meetings, which she still attended.

Grandmother also stated she had had no personal contact with mother from the second incident with R.S. until the May 5 incident. As to May 5, she testified she had not planned for mother to be there. In addition, she denied everyone was wearing beach clothing, explaining that was normal wear for the the children and that she had purchased a plastic swimming pool a few weeks earlier. As to the statement by Diane, mother's

7

godmother, that she had seen mother at the house, Diane meant her own house, not grandmother's. Grandmother also did not believe it was a problem to let Diane monitor visits, even though she was close to mother.

Grandmother disagreed with the testimony that she was unable to keep mother away, although she did concede it was "very stressful to have to constantly push [mother] away and keep her at a distance . . . ." She believed she could protect the children, as evidence by her 911 calls when mother had come to her house. She testified she would enforce the restraining order against the parents. Neither parent should have a relationship with the children except maybe monitored visitation at a safe place. But she would never allow anyone to be alone with the children except for herself or R.S.'s paternal grandmother, who also loved them.

In ruling in favor of removal of the children the court noted the evidence that showed grandmother was "a very loving, affectionate and nurturing woman[,] . . . described [as] quite intelligent and [who] has consistently worked and shown the children how to prepare their life in a way to be productive and constructive." The children's best interest "for love, nurturing and good health have been exhibited in exemplary fashion by" grandmother. But "[t]hat is not the sole responsibility of an adoptive parent. . . . [S]afety and stability are as important as love and affection. Love and affection can do so, so very much for a child. But if the child is not safe, it is for [naught]. [¶] As has been characterized, the safety issue and stability issue, those two issues have not been provided consistently for the two [children]. . . . [A]s to the totality of the circumstances, as present from 2010, 2011 and 2012, are such that one cannot reasonably conclude these children have been safe nor in a stable environment. [¶] . . . [T]he best interests of the child for safety and stability have not [been exhibited in exemplary fashion by this caregiver]."

In making these statements the court relied on SSA's reports and testimony, including that of the adoption social worker. Reviewing the totality of the circumstances

8

it also found it was not unreasonable for SSA to conclude that mother, "who is a concededly criminal person," did not hesitate to lie when it suited her and had "contact with these children of an improper nature." She did not find grandmother credible when she said she did not know mother was at her house during May 2012. Even though she told mother to leave she was not surprised to see her.

The court acknowledged the children would be "devastate[ed]" to be removed, but again emphasized their safety was "fundamental." It recommended that the children be removed gradually "with [a] full compl[e]ment of therapy and safety mechanisms in place . . . ."

DISCUSSION

A child may be removed from the custody of a prospective adoptive parent if "removal is in the child's best interest." (§ 366.26, subd. (n)(3)(B).) We review a court's decision to terminate placement for abuse of discretion. (*In re N.M.* (2011) 197 Cal.App.4th 159, 171 [abuse of discretion used in reviewing whether removal of child from home in child's best interest]; see *In re C.B.* (2010) 190 Cal.App.4th 102, 123, fn. 5 [whether termination of parental rights in child's best interest reviewed for abuse of discretion]), giving the juvenile court's decision ""broad deference"" (*In re Levi H.* (2011) 197 Cal.App.4th 1279, 1291). In doing so, we view the evidence in the light most favorable to the court's decision (*ibid.*) and do not substitute our judgment for that of the trial court (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318). We do not reverse ""unless the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious or patently absurd determination."" (*Ibid.*)

None of the witnesses dispute, and the court found that, grandmother is a wonderful caretaker and the children love her. In addition, there is no disagreement that it will be very difficult for the children to leave her. The only question is whether, on

9

balance, grandmother can ensure the children's safety, specifically whether grandmother can keep mother away from them.

Grandmother argues the court erred because it failed to take into account her current circumstances, including her therapy and participation in other services, rather than exclusively considering the prior occurrences. But the court considered all the events, the SSA reports, and the testimony, including that of the adoption social worker. The court specifically stated it had reviewed the totality of the circumstances, which perforce must include current circumstances. Furthermore, unless there is a specific failure to include current circumstances in the court's analysis, we must presume it did. (See *Armando D. v. Superior Court* (1999) 71 Cal.App.4th 1011, 1025.)

Further, only seven months had elapsed since the May 5 incident. Given the past history of multiple occurrences where grandmother had not protected the children from mother, that is not a particularly long time to guarantee that, over the long run, grandmother would not allow additional contact with mother. The court specifically did not believe grandmother's testimony she did not know mother would be visiting on May 5. And some of grandmother's testimony gives pause. She still believed it might be acceptable for the children to see their parents, albeit at a neutral location with a monitor. Moreover, she saw nothing wrong with allowing mother's godmother, who is close to mother and enjoys her company, to act as a monitor. And grandmother was unable to accept responsibility for prior actions, instead making excuses.

Finally, but not least important, grandmother testified it is difficult for her to "constantly push [mother] away and keep her at a distance . . . ." This does not support grandmother's no doubt well-intentioned belief she would be able to prevent mother from seeing the children but instead reveals the underlying problem that apparently has

10

plagued grandmother from the beginning.[2]  Although grandmother focuses on the current circumstances, the adoption social worker was clear her evaluation was based on the long term, and it is reasonable to consider grandmother's overall history with mother.  She had made promises before to keep mother away and had not been able to fulfill them.

In a related argument grandmother argues SSA did not prove by a preponderance of the evidence removal was in the children' best interests.  But, as discussed above, there was substantial evidence that allowing the children to remain with grandmother would be detrimental to their best interests.  That there was conflicting evidence is not relevant to our consideration. "On review of the sufficiency of the evidence, we presume in favor of the order, considering the evidence in the light most favorable to the prevailing party, giving the prevailing party the benefit of every reasonable inference and resolving all conflicts in support of the order." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 576.)

Grandmother relies on the prior ruling of a commissioner who decided the application for a restraining order.  When the commissioner analyzed the circumstances she came out on the side of keeping the children with grandmother.  And grandmother notes there were no additional negative facts thereafter to bolster a finding of removal.  But, as SSA points out, there was no full hearing with testimony before she issued the restraining order.  In addition, the commissioner stated she would not order removal "*today*" (italics added).  The fact a second judicial officer reached a different conclusion after hearing extended testimony does not mean the ruling at issue here was incorrect or that there was insufficient proof to support it.

---

[2]  Grandmother points to the trial court's statement the incidents involving R.S. have limited relevance.  But we believe that, even though the specifics of the events may not be as relevant as those involving the children, the fact the incidents occurred at all is relevant to show the pattern of grandmother's inability to protect the children from mother.

Grandmother also comments that SSA has not taken any action to remove R.S. from her custody, arguing this proves there is no danger to any of the three children. But R.S. is grandmother's adopted son. His removal from her custody involves a different procedure with stricter standards. (§ 361, subd. (c).) And there is nothing in the record to show SSA will not initiate such a procedure.

We do not doubt the court had to make a difficult decision. As stated above, no one questioned grandmother's love for the children. Grandmother disagrees with the trial court that the children's safety and stability is as important as the fact they have a strong attachment to her and R.S, pointing to testimony to support this. But safety is a primary factor. Children are removed from their parents' custody in the same situation. The parents may love their children and the children have never known another home. But if the parents cannot protect them, the children cannot remain in their custody.

We applaud grandmother for the care and love she has given the children and we sympathize with them. We do not doubt this will be very difficult for them and agree with the court's order of gradual removal and therapy. But the record does not reveal the court abused its discretion in ordering removal and we must affirm.

DISPOSITION

The petition is denied.

THOMPSON, J.

WE CONCUR:

O'LEARY, P. J.

RYLAARSDAM, J.

12